UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUTTERGLOVE, INC., <br>  Plaintiff, <br> v. <br><br> AMERICAN DIE and ROLLFORMING, INC., et al., <br>  Defendants. | Case No. 2:16-CV-02408-WHO <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br> Re: Dkt. No. 55, 56 |

## INTRODUCTION

Gutterglove, Inc. ("Gutterglove") brought this action against American Die and Rollforming, Inc. ("ADR") and Artesian Home Products, Inc. dba Valor Gutter Guard ("Artesian") (collectively, "defendants"), alleging infringement of two United States patents related to rain gutter debris preclusion systems, generally referred to as "gutter guards." After the case was filed, defendants sought to invalidate the patents via inter partes review ("IPR") with the Patent Trial and Appeal Board (PTAB). I denied Gutterglove's request to stay the case pending IPR, but subsequently adopted the parties' joint proposal to stay with the exception of one motion for summary judgment of noninfringement. This order addresses that motion and plaintiff's motion to strike a declaration submitted in support of that motion.

For the '454 patent, Gutterglove has failed to demonstrate a genuine issue that defendants' products infringe any of the claims. It has advanced disputed facts from which a jury could find infringement of the '747 patent based on defendants' Diamond Product, but not the Louvered Products (the Valor, Bolt and Arrow). Accordingly, defendants' motion is GRANTED IN PART and DENIED in PART. And since the PTAB has granted defendants' petitions for review, this

case is STAYED pending resolution of those petitions.

## BACKGROUND

## I. FACTUAL BACKGROUND

### A. The Parties and The Claims

Gutterglove owns U.S. Patent No. 9,021,747 ("the '747 patent"), entitled "Supported Mesh Debris Preclusion System for Gutters," and U.S. Patent No. 8,479,454 ("the '454 patent"), entitled "Corrugated Mesh Debris Preclusion System for Gutters." '454 patent (Song Decl. ¶ 2, *id.* Ex. 1, Dkt. No. 28-2); '747 patent (Song Decl. ¶ 3. *id.* Ex. 2, Dkt. No. 28-3). Both patents relate generally to the field of rain gutter debris preclusion systems, referred to as "gutter guards." '454 patent at 1:14–16; '747 patent at 1:13–15. Gutterglove alleges that four of defendants' products ("the Accused Products") infringe the '747 patent claims 1–6 and 16–20, wherein claims 1 and 16 are independent claims, and the '454 patent claims 1–3, 12–14 and 16–17, wherein claims 1, 12, and 16 are independent claims.[1] Compl. (Dkt. No. 1); *see also* Infringement Contentions (Costello Decl. ¶ 6; *id.*, Ex. 3, Dkt. No. 55-6). ADR and Artesian make and sell the Accused Products. Bryer Decl. ¶ 15; *see also* Defs.' Advertisements for the Accused Products (Bryer Decl., Exs. 4–7).

The '454 patent "relates to rain gutter debris preclusion systems which include a screen or filter element supported above a rigid structural support element for filtration of debris out of water before passing into the gutter." '454 patent at 1:15–19. Independent claim 12 of the '454 patent provides,

> A gutter guard attachable overlying a gutter, comprising:
>
> a screen; a substantially rigid support underlying said screen and in contact with an underside of said screen;
> said rigid support including a plurality of holes therein;
> said screen being bent into a configuration including multiple crests alternating with multiple troughs, with said, troughs closer to said rigid support than said crests and with at least some of said troughs in contact with said rigid support;
> wherein said rigid support includes a pair of slots therein including an upper slot and a lower slot, said upper slot open in a direction

---

[1] During the hearing on defendants' motion for summary judgment, Gutterglove represented that it was "dropping" claim 1 of the '454 patent.

facing an open side of said lower slot, said screen including an upper edge opposite a lower edge with said upper edge of said screen located within said upper slot of said rigid support and said lower edge of said screen located within said lower slot of said support, and with a size of said screen between said upper edge and said lower edge similar to a distance between said upper slot and said lower slot; and,

wherein said rigid support includes a floor spaced below said screen, said floor including ribs extending up from said floor to tips in contact with said screen, said floor including said holes therein with said holes located between said ribs, said ribs extending non-parallel with said troughs.

'454 patent at 10:4–29.

The '747 patent "relates to filter screen mesh type gutter guards which have a fine mesh of material to preclude leaves and other debris from falling into the gutter, while allowing water to filter through the mesh and into the gutter." '747 patent at 1:16–19. Independent claim 1 from the '747 patent provides,

A leaf preclusion system for a roof gutter having a gutter lip for keeping leaves and other debris out of the roof gutter while allowing water to pass thereinto, comprising: a sheet of fine mesh material; said sheet of fine mesh material having an upper edge adapted to be located above a lower edge and with said sheet of fine mesh material overlying the roof gutter; said sheet of fine mesh material being corrugated with ridges extending at least part of the way from said upper edge to said lower edge and wherein said lower edge being adjacent the gutter lip when the system is in use, wherein the water is allowed to pass through said sheet of fine mesh material into the roof gutter,

wherein at least one of said ridges extends from at least one of said upper edge and said lower edge.

'747 patent at 7:62–8:8.

Following claim construction briefing and argument, I issued a Claim Construction Order construing four terms from the '454 patent and three terms from the '747 patent as follows:

| **'454 PATENT** | |
|---|---|
| "a floor" (claims 1, 7, 12, 16) | "a surface of the underlying support that resides slightly below the screen" |
| "a floor on a portion of said rigid support" (claim 1) | "a lower portion of the rigid support" |
| "screen" (claims 1, 2, 12, 13, 16, 17) | "mesh formed into corrugations with crests and troughs with openings small enough to preclude grit and other fine debris from passing into the gutter, but that allows water to pass into the gutter." |
| "plurality of | "two or more openings penetrating the floor which allow water to be |

| holes" (claims 1, 12, 16) | conducted through the floor." |
|---|---|
| **'747 PATENT** | |
| "fine mesh material" (claims 1–6, 11–13, 16–20, 21) | "a mesh filter member with openings small enough to filter out fine debris while allowing water to pass therethrough and is imbued with properties of sufficient stiffness and ability to overcome water droplet adhesion characteristics without requiring an underlying support" |
| "being corrugated with ridges" (claims 1, 16) | "shaped into a series of parallel ridges and grooves so as to give strength, extending generally perpendicular to a long axis of a gutter" |
| "ridges" (claims 1, 2, 5, 6, 12, 16, 17, and 21) | "raised bands or crests" |

### B. The Accused Products

The four Accused Products can be divided into two groups: those with an underlying support beneath the mesh filter screen (the Valor™, Bolt™, and Arrow™)(collectively, the "Louvered Products"), and those with no underlying support (the "Diamond Product"). *See* Infringement Contentions, Ex. A at 8–9; Bryer Decl. ¶¶ 13, 19; Stein Decl. ¶¶ 51–52. The Valor, Bolt, and Arrow products differ only in the shape of the filtration screen's embossed pattern or "ridges," which extend between an upper edge and a lower edge of the screen. Bryer Decl. ¶ 16. The Valor product has S-shaped ridges, the Arrow has arrow-shaped ridges, and the Bolt has "lightning bolt-shaped" ridges. Infringement Contentions, Ex. A; Bryer Decl. ¶¶ 10, 18.



The rigid underlying supports of the Valor, Bolt, and Arrow products contain "louver vanes," such as that displayed below in the photograph of the Bolt product sample. *See* Bryer Decl. ¶ 14 (explaining that his "louvered support was designed to provide rigidity and at the same time avoid the problems with the prior art by eliminating a floor and its inherent tendency to pool water and debris.").

**The Bolt:**



The Diamond Product has "diamond-shaped" ridges, and, as mentioned, no underlying support. Bryer Decl. ¶¶ 19–20. The wire in its mesh screen is thicker than that in the Valor, Bolt, and Arrow products. Bryer Decl. ¶¶ 26–27. The shapes in the screens force water flow to break its vertical flow pattern by directing it left or right. Bryer Decl. ¶¶ 10, 17–20.



## II.     PROCEDURAL HISTORY

On October 7, 2016, Gutterglove filed this action against defendants alleging: (1) infringement of the '454 patent, (2) infringement of the '747 patent, and (3) willful infringement of the '454 and '747 patents.  Compl (Dkt. No. 1).  Defendants answered with affirmative defenses, including non-infringement, and asserted declaratory relief counterclaims for non-infringement and invalidity of the asserted patents.

On September 18, 2017, I issued the Claim Construction Order.  Claim Construction Order (Dkt. No. 42).

On October 31, 2017, Gutterglove moved to stay the proceedings "in view of" the three petitions for *Inter Partes* review filed by defendants.[2]  Dkt. No. 50.  The defendants seek to invalidate the patents based on obviousness.  On November 28, 2017, I denied Gutterglove's motion and adopted a jointly requested proposal staying all discovery, case management deadlines, and substantive motion practice, with the exception of one motion for summary judgment of non-infringement.  11/28/17 Minute Entry (Dkt. No. 54).

On February 2, 2018, defendants filed a motion for summary judgment of noninfringement for each of the asserted claims of both patents, and on their counterclaim seeking declaratory judgment of noninfringement.  Defs.' Mot. for Summ. J. ("MSJ")(Dkt. No. 55-1).  On March 14, 2018, Gutterglove filed a motion to strike the declaration of Slate E. Bryer, submitted by defendants in support of their motion for summary judgment.  Mot. to Strike ("Mot.")(Dkt. No. 56).  I heard argument on April 18, 2018.

## LEGAL STANDARD

## I.     MOTION TO STRIKE IMPROPER OPINION TESTIMONY

Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12.

Rule 702 allows a qualified expert to testify "in the form of an opinion or otherwise"

---

[2] During the hearing, defense counsel represented that PTAB granted all three petitions for review.

where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Expert testimony is admissible under Rule 702 "if it is both relevant and reliable." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Id.* Under the reliability requirement, expert testimony must "relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Id.* "Importantly, there must be a recognized body of knowledge, learning, or expertise upon which the witness relies. Where there is no field of expertise, nobody will qualify as an expert witness on the subject." *Perez v. Seafood Peddler of San Rafael, Inc.*, No. 12–cv–00116–WHO, 2014 WL 2810144, at *2 (N.D. Cal. June 20, 2014) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. Fed. R. Evid. 702 advisory committee notes.

Under Rule 701, "[i]f a witness is not testifying as an expert," a lay witness is permitted to testify "in the form of an opinion" when it is:

> **(a)** rationally based on the witness's perception;
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

## II.    SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party "is entitled to a judgment as a matter of law [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* (internal quotation marks omitted). The moving party need only show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322.

### III.  SUMMARY JUDGMENT OF NONINFRINGEMENT

Summary judgment of noninfringement requires a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted). "The determination of infringement, both literal and under the doctrine of equivalents, is a question of fact." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003); *see also Kilopass Tech. Inc. v. Sidense Corp.*, No. 10–cv–02066–SI, 2012 WL 3545286, at *4 (N.D. Cal. Aug. 16, 2012). Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may show that summary judgment of noninfringement is proper either by

producing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to create a material factual dispute as to any essential element of the patentee's case. *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). "Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims." *Id.*

Direct infringement may be proven either by literal infringement or under the doctrine of equivalents. "Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s)." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Id.* "The doctrine of equivalents holds that even if an accused product does not literally infringe the asserted claims of a patent, the product may infringe if the differences between the element of the accused product at issue and the claim limitation at issue are insubstantial." *Kilopass*, 2012 WL 3545286, at *7. To defeat a defendant's motion for summary judgment of noninfringement under the doctrine of equivalents, the plaintiff must provide "particularized testimony and linking argument on a limitation-by-limitation basis that create[s] a genuine issue of material fact as to equivalents." *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328–29 (Fed. Cir. 2007). "Whether equivalency exists may be determined based on the 'insubstantial differences' test or based on the 'triple identity' test, namely, whether the element of the accused device performs substantially the same function in substantially the same way to obtain the same result." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376 (Fed. Cir. 2008). "Whether a claim is infringed under the doctrine of equivalents may be decided on summary judgment if no reasonable jury could determine that the limitation and the element at issue are equivalent." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999).

## DISCUSSION

Defendants argue that they are entitled to summary judgment of noninfringement for both

patents because each contains claim elements that do not exist in the Accused Products.  *See generally* MSJ (Dkt. No. 55-1).  Prior to opposing defendants' motion for summary judgment, Gutterglove moved to strike the declaration of Slate Bryer submitted in support of defendants' motion, on grounds that the declaration (1) fails to comply with the evidentiary requirements of Federal Rule of Civil Procedure 56(c), (2) presents inadmissible lay opinion, (3) seeks to improperly introduce expert opinion, and (4) contains information irrelevant to infringement. Mot. to Strike ("Mot.")(Dkt. No. 56); *see* Bryer Decl. (Dkt. No. 55-15).  It requests that the entire declaration be stricken, or in the alternative, paragraphs 7–14, 19, 21–30, related exhibits 8 and 9, and associated portions of defendants' MSJ.  Mot. at 2–3.  I will address the motion to strike and then the motion for summary judgment of noninfringement.

## I.     MOTION TO STRIKE BRYER DECLARATION

Bryer, the owner of both ADR and Artesian, has worked in the sheet metal trade for 22 years.  Bryer Decl. ¶ 3.  He designed and made the sheet metal stamping dies used to make the Accused Products.  *Id*. ¶ 5.  He is also a co-inventor on U.S. Patent No. 9,284,735 ("the '735 patent"), the patented technology underlying the Valor Accused Product.  *Id*. ¶ 8; *see also* '735 patent (Bryer Decl., Ex. 1).  Bryer attached a computer disk to his declaration (Ex. 8)("Video Demonstration"), containing a video he offered as a "visual representation illustrating the lack of rigidity and strength of the mesh filter screens of the Valor, Bolt, and Arrow Accused Products." Bryer Decl. ¶ 23.  In the Video Demonstration, Bryer "test[ed]" the mesh screens of the Louvered Products by separating them from their underlying supports, preparing them as one-piece frameless gutter guards, and "subject[ing] each assembly" to various loads using two-pound, three-pound, and five-pound dumbbells.  *Id*. ¶¶ 23–24.

Gutterglove challenges the Bryer Declaration on several grounds.  First, it argues that the Bryer declaration should be stricken because it admits that certain statements are made "upon information and belief" and therefore lack the requisite personal knowledge.  Mot. at 3–4 (citing Bryer Decl. ¶ 2).  It requests that the whole declaration be stricken, and specifically takes issue with paragraphs 11 and 12 (attesting to Bryer's "belie[f]" regarding the timing that he created a particular stamp die), paragraph 14 (comparing characteristics of the '454 patent and prior art),

paragraph 25 (offering a prediction as to the performance of the unsupported mesh screens of the Louvered Products), and paragraphs 23 through 30 (describing his observations and conclusions from the Video Demonstration). These paragraphs are based on Bryer's personal knowledge as inventor and owner of the companies that Gutterglove is suing for patent infringement, or on his personal knowledge as the individual who performed the Video Demonstration submitted in support of defendants' motion for summary judgment. Lack of personal knowledge does not provide a valid basis for striking this testimony, but his speculative "predictions" in paragraph 25 will be stricken. *See* Fed. R. Civ. P. 56(c)(4)("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. 597, 2006 WL 1330002, at *3 (N.D. Cal. May 15, 2006)("Mr. Griewski's testimony concerning the Sarns 9000—to the extent that it is premised on his personal knowledge regarding the machine and the way that it operates—is admissible.").

Next, Gutterglove argues that statements in the Bryer Declaration constitute inadmissible lay opinion. Under Federal Rule of Evidence 701, a non-expert witness's opinion must be "rationally based on the witness's perception[,]" "helpful" to the jury, and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. As previously discussed, Bryer's statements (with the exception of the prediction) are based on his own perception. And they are helpful to the jury because they describe his intent as inventor of the Accused Products, and his observations when testing the unsupported screens of the Louvered Products. *See United States v. Begay*, 42 F.3d 486, 502 (9th Cir. 1994)(finding testimony concerning events depicted in video admissible as lay witness opinion).

Lastly, I disagree with Gutterglove that Bryer's opinions are based on specialized knowledge. I acknowledge that Bryer refers to himself as "a person of skill in the gutter guard arts," but this does not *automatically* relegate his opinions to the realm of an expert. Unlike the testimony at issue in *Jerden v. Amstutz*, 430 F.3d 1231 (9th Cir. 2005) and *United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997), cases relied upon by Gutterglove, Bryer's

1    declarations do not pertain to "detailed and scientific observations" about the Accused Products,

2    *see Jerden*, 430 F.3d at 1239, nor do they concern "the type of 'specialized knowledge' of law

3    enforcement governed by Rule 702[,]" *Figueroa-Lopez*, 125 F.3d at 1246.  To the contrary,

4    Bryer's statements regarding his observations while placing dumbbells on mesh screens are within

5    the realm of common experience.  *Cf. McCloskey v. California*, No. 05-CV-1377 W AJB, 2008

6    WL 4283817, at *1 (S.D. Cal. Sept. 16, 2008)(finding lay witness testimony regarding use of force

7    during arrest was "beyond the realm of common experience, and require[d] specialized knowledge

8    and training on police policy and practices.").

9         Gutterglove also seeks to strike paragraphs 7 through 13, which relate to Bryer's '735

10   patent.  Gutterglove contends that these paragraphs are irrelevant to the issue of infringement.  It

11   is true that "[w]hen infringement is the issue, the validity of the patent is not the question to be

12   confronted."  *Commil USA, LLC v. Cisco Systems, Inc.,* 135 S.Ct. 1920, 1928 (2015).  And "[t]he

13   grant of a separate patent on the accused device does not *automatically* avoid infringement, either

14   literal or by equivalency."  *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir.

15   1996)(emphasis added).  The *National Presto* court went on to note that the issue of "[w]hether a

16   modified device is within the scope of the prior patent, literally or by equivalency, depends on the

17   particular facts."  *Id*.  Contrary to Gutterglove's position, the court explicitly held that "[t]he fact

18   of separate patentability *is relevant*, and is entitled to due weight."  *Id*. (emphasis added).  It just

19   does not mandate that "there can not be infringement as a matter of law."  *Id*.  Since Bryer's

20   statements about the patent underlying the Accused Products are relevant to infringement, those

21   paragraphs will not be stricken.

22        Gutterglove's motion to strike is DENIED IN PART AND GRANTED IN PART.  Bryer's

23   statement of prediction in paragraph 25 will be stricken because it is not based on personal

24   knowledge.

25   **II.  MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT**

26        **A.      Preliminary Issues**

27        In conjunction with their motion for summary judgment, defendants request that I take

28   judicial notice of the dictionary definitions of parallel and perpendicular.  Defs.' Request for

Judicial Notice (Dkt. No. 55-29).  Gutterglove opposes the request.  Gutterglove's Objection and Opp'n to Defs.' RJN (Dkt. No. 67)(citing Fed. R. Evid. 201(e)).  Because the definitions are not the proper subject of a request for judicial notice, defendants' request is DENIED.

Since we are past the claim construction stage, but the parties clearly disagree on the scope of certain claim terms, I give those terms "full range" of their plain and ordinary meaning, *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), "according to the customary understanding of a person of ordinary skill in the art who reads [it] in the context of the intrinsic record." *Agilent Technologies, Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1376 (Fed. Cir. 2009).  But I need not decide on a precise definition to ascribe to the plain and ordinary meanings. *E.g.*, *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-3587-WHO, 2015 WL 757575 (N.D. Cal. Feb. 20, 2015); *Apple, Inc. v. Samsung Electronics Co.*, No. 12–cv–00630–LHK, 2014 WL 252045, at *3–5 (N.D. Cal. Jan. 21, 2014).  This decision does not improperly delegate claim construction to the jury.  *See Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1325 (Fed. Cir. 2013) ("[T]he denial of a pretrial motion for summary judgment of noninfringement does not, by itself, show that the district court delegated claim construction to the jury.").

**B.     Claim 1: Infringement Based on the '454 patent**

The '454 patent specification summarizes the invention as "a filter mesh based two part gutter guard … including a substantially rigid support and a mesh overlying the support."  '454 patent at 1:58–60.

**1.          Literal Infringement**

Defendants argue that Gutterglove's infringement counts based on the asserted claims of the '454 patent must fail because the Accused Products lack the following limitations: (1) a floor, (2) a floor on a portion of a rigid support, (3) a plurality of holes, (4) said floor including ribs extending up from said floor, (5) said floor spaced from said screen, (6) said ribs extending between said lateral ends of said rigid support, (7) said holes located between said ribs, and (8) said troughs extending substantially perpendicular to said ribs.[3]  MSJ at 18–31; *id.* at 52–65.  As an

---

[3] This last element (8) is only included in claim 1 of the '454 patent, which Gutterglove represented during the hearing that it is no longer pursuing.

13

initial matter, Gutterglove concedes that the Diamond product does not include "ribs extending up from said floor" or "said holes located between said ribs," and therefore does not infringe the asserted claims of the '454 patent. Opp'n at 13.

Turning to the Louvered Products, defendants argue that they do not possess a "floor" as construed. Bryer Decl. ¶¶ 7–8; Stein Decl. ¶¶ 51–52. Independent claims 12 and 16 of the '454 patent each require the element of "a floor," which was construed as "a surface of the underlying support that resides slightly below the screen." Defendants insist that the louvered support of the Valor, Bolt, and Arrow products, described in the '735 patent, represents a rigid underlying support for these two-piece gutter guards specifically designed *not* to have any "horizontal surface" for the water because such surfaces tended to clog with algae and moss, which rendered those systems inoperable. Bryer Decl. ¶¶ 7–8, 10, 14; *see* '735 patent at 4:40–50.

In response, Gutterglove underscores the irrelevance of the '735 patent and highlights the testimony from defendants' own expert to argue that these products do have a "floor" as that term is construed. First, it points to the two "lips" that run the entire length of the products, then it emphasizes that every eighth louver is a horizontal support structure or "crosswise lip". Opp'n at 14–15; *see* Stein Dep. at 25–29. Gutterglove urges that together these structures meet the definition of "floor" as previously construed—"a surface of the underlying support that resides slightly below the screen."[4]

Below is a depiction of the surfaces that Gutterglove contends comprise the floor:

---

[4] Its expert further opined that the base of each louvre has a small horizontal lip, which further comprises the "floor." *See* Liebert Decl. ¶ 55. In its opposition, however, Gutterglove seems to disclaim this element as comprising part of the "floor," and focus on the lateral and crosswise lips. *See* Opp'n at 16 ("Gutterglove does not and has not argued that the louvers by themselves are equivalent to the 'floor.' The floor of the Louvered Products is the structures supporting the louvers, e.g., the lateral and crosswise lips.").



Figure 8

Figure 3 from the patent specification depicts the preferred embodiment of the '454 patent, including the floor (50) with holes (56) and ribs extending up (58), underlying the corrugated mesh (20):



Fig. 3

*See* '454 patent at 3:47–50; *id*. at 7:44–56.

From these depictions, it seems evident that the *three* surfaces of the Louvered Products (the two lateral lips and every eighth crosswise lip) do not read on the "floor" claimed in the '454 patent. But even if I accept Gutterglove's characterization that the Louvered Products have a "floor," the error in this reasoning is exposed when considering additional claim limitations. First, the "floor," as identified by Gutterglove, does not have a "plurality of holes."[5] I construed

---

[5] Claims 12 and 16 differ from claim 1 in their descriptions of the "rigid support," the "floor," and the "plurality of holes," but the result is the same. Claim 1 explicitly states "floor including plurality of holes therein," whereas claim 12 provides, "said rigid support including a plurality of holes therein," and later indicates that the "rigid support includes a floor spaced below said screen, said floor including ribs extending up from said floor to tips in contact with said screen, said floor including said holes therein with said holes located between said ribs, said ribs extending non-parallel with said troughs." '454 patent at 9:16–16 (claim 1); *id*. at 10:8, 24–29 (claim 12); *see also id.* at 10:47–17 (claim 16).

15

United States District Court
Eastern District of California

"plurality of holes" as "two or more openings penetrating the floor which allow water to be conducted through the floor." Gutterglove contends that the openings between the louvers are the holes:



Opp'n at 16; Liebert Decl. ¶¶ 57–58. It correctly points out that the claims do not require the holes be of a certain size or shape. Opp'n at 17. They do, however, require that the holes *penetrate* the floor. The openings identified by Gutterglove as the "holes" do not penetrate the three surfaces Gutterglove identifies as the "floor." Liebert's conclusory opinion that "[t]hese openings penetrate the floor" does not create a disputed issue of fact.

Next, ignoring the indisputable evidence that the Louvered Products have no "floor" and no "plurality of holes," Gutterglove insists that the louvers are the ribs of the '454 patent. Opp'n at 17–19; Liebert Decl. ¶¶ 59–62. Claim 12 provides that the floor "includ[es] ribs extending up from said floor… ." '454 patent at 10:25–26 (claim 12). The ribs of the '454 patent are depicted in figure 13 of the patent:



Once again, Gutterglove has not demonstrated how the louvers of the accused products extend up from the three surfaces it identifies as the floor. It therefore has not demonstrated a disputed issue

on this claim element.

Since Gutterguard fails to raise material issues of fact as to a number of claim limitations in the '454 patent, "there is no literal infringement as a matter of law." *Bayer AG*, 212 F.3d at 1247.

## 2. Doctrine of Equivalents

In opposing defendants' motion, Gutterglove argued for literal infringement of the '454 patent claims and did not offer evidence that the claims were infringed under the doctrine of equivalents. *See* Opp'n at 13–23. It discussed the doctrine only in response to defendants' prosecution history estoppel argument. *See id.* at 22–23. Since it is Gutterglove's burden to "present particularized evidence of equivalents in opposition to the motion for summary judgment[,]" *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1323 (Fed. Cir. 2007), I see no basis to consider Gutterglove's '454 infringement claims under the doctrine of equivalents. *See id.* at 1328 (explaining plaintiff's evidentiary burden under the doctrine of equivalents). I GRANT summary judgment in favor of defendants on the '454 patent.

## C. Claim 2: Infringement Based on the '747 patent

The '747 patent specification describes the invention as:

> [A] leaf preclusion system … for a gutter which includes a filter layer … which filters out debris … while allowing water to pass therethrough. Uniquely, no underlying support is required beneath the filter member. The filter member is itself imbued with properties of sufficient stiffness and the ability to overcome water droplet adhesion characteristics without requiring an underlying support. Strength is provided to the filter member by providing a corrugated form … . Such a cross-section for the mesh causes the mesh to have greater strength particularly in resisting bending. … [T]hese corrugations greatly resist flexing… .

'747 patent at 2:3–20. Defendants aim for a finding of noninfringement based on their contentions that the Louvered Products lack the "fine mesh material" as construed, and none of the Accused Products meet the claim limitation of "being corrugated with ridges." MSJ at 35–52. Each of the asserted independent claims of the '747 patent include both of these claim limitations. *See* '747 patent, claim 1 at 7:62–8:8; *id.*, claim 16 at 10:1–12.

### 1. "Fine Mesh Material"[6]

I construed this term as "a mesh filter member with openings small enough to filter out fine debris while allowing water to pass therethrough and is imbued with properties of sufficient stiffness and ability to overcome water droplet adhesion characteristics without requiring an underlying support."

Defendants rely on the Bryer declaration and his video demonstration to argue that the Louvered Products cannot infringe because those products do not have a mesh filter screen with "sufficient stiffness" to function without an underlying support. MSJ at 35–39; *see* Bryer Decl. ¶¶ 21–25; Video Demonstration (Bryer Decl., Ex. 8). According to Bryer, the Louvered Products lack "sufficient stiffness" in the absence of their underlying support structures because they collapsed under two pounds of weight, whereas Gutterglove's gutter guard withstood ten pounds of weight. MSJ at 36–37. Bryer also declared that he designed these products to be a two-piece construction in which the mesh screens are dependent on the underlying louvered structure for support. Bryer Decl. ¶ 25.

As an initial matter, "[i]nfringement, either literally or under the doctrine of equivalents, does not arise by comparing the accused product ... with a commercialized embodiment of the patentee." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc) (internal quotation marks omitted). It is irrelevant that the Accused Products withstood only one-fifth of the load of the embodying product in Bryer's Video Demonstration. To find literal infringement, the limitations in the claims must be present in the accused products. *See, e.g.*, *Bayer AG*, 212 F.3d at 1247 (describing process for finding literal infringement). While I agree that "sufficient stiffness" requires that the fine mesh material support *some* load, I see no basis in the intrinsic record to assign a particular weight to the anticipated debris load. *See* '747 patent at 3:6–9 ("Another object of the present invention is to provide a debris preclusion system for a rain gutter which is sufficiently rigid to prevent collapse when encountering loads such as debris loads thereon."). I cannot conclude that the unsupported mesh screens of the Louvered

---

[6] For purposes of summary judgment, defendants did not address the issue of whether the Diamond product meets the element of "fine mesh material." Defs.' MSJ at 4 n.4; *id.* at 9 n.6; *see* Bryer Decl. ¶ 19.

Products lack sufficient stiffness because they could not withstand the same load as Gutterglove's gutter guard.

Gutterglove contends that Bryer's Video Demonstration and Stein's testimony amounts to an admission that the mesh screens of the Louvered Products are self-supporting, which is all that is required under the '747 patent. Opp'n at 5–6; *see* Bryer Decl. ¶¶ 24, 26–28; Stein Dep. at 32:22–25 (Song Decl. ¶ 3, *id.*, Ex. 2). Even assuming that the mesh screens must hold some amount of additional weight (which Gutterglove argues is not required by the claim language), Gutterglove (perhaps following defendants' lead) offered its own expert who performed an experiment using the unsupported mesh screens of the Louvered Products.[7] *See* Liebert Decl. ¶¶ 15–21 (Dkt. No. 65). Gutterglove's expert, Gregory Liebert, created a mock-up full scale roof assembly and tested the unsupported mesh screens of the Louvered Products with three different load types: ultimate load tests with carbon steel shapes, volume capacity tests with stone and organic yard debris, and a volume capacity test with snow and ice. *Id.* ¶ 19. Liebert performed load tests and determined that the unsupported Valor and Bolt screens can hold 8 pounds 2.2 ounces of steel weights, and the unsupported Arrow screen can hold 6 pounds 11.5 ounces of steel weights. Liebert Decl. ¶ 22. Because the unsupported screens are stiff enough to be self-supporting and hold a load representative of typical roof debris, Gutterglove argues that they are "imbued with properties of sufficient stiffness and ability to overcome water droplet adhesion characteristics without requiring an underlying support." Liebert Decl. ¶¶ 33–34.

In Reply, defendants highlight additional language in the '747 patent's specification suggesting that the mesh must be sufficiently strong to resist bending and flexing. *See* '747 patent at 2:14–20. They point to the photographs of Liebert's experiment that, in their estimation,

---

[7] Defendants challenge Leibert's experiment because it included "architectural shingles with starter strip[.]" Leibert Decl. ¶ 16. Defendants contend that the use of a "starter strip," a tacky glue strip beneath the shingles, served to essentially glue the structure into place. Reply at 9–11 (citing Further Costello Decl. ¶ 4, Ex. 1). They insist that the mesh screens depended on this extra support to function, and Gutterglove's expert even admitted such. *Id.*; *see* Leibert Decl. ¶ 40(ii)(a)("The gutter guards were never intended to be installed and function without the contribution of the roof materials for stability and support."). As discussed below, the demonstrations offered by both sides fail to create a genuine issue of material fact on whether the Accused Products infringe the '747 patent, so I need not address the parties' issues with the other's demonstration.

19

showed the unsupported mesh screens of the Accused Products was "significantly bowed/bent under only 12.2 ounces of leaf debris[.]" Reply at 6; *see id.* at 7 (depicting photograph showing a "definite delta").[8] Gutterglove points out numerous flaws in defendants' "new" argument: (1) a comparison between an embodying product and Accused Products is irrelevant; (2) defendants fail to support their "resists bending" argument with testimony from Stein or Bryer; (3) the claim construction does not include any reference to "bending"; (4) the claims themselves do not mention "bending"; and (5) defendants do not propose a definition for an allowable degree of "bending," so, even if this new factor was considered part of the claim term, it would present an issue of fact for the jury's consideration.[9]

But the parties' proffered evidence and analysis strays too far from a comparison of the claims and the Accused Products. Working backwards, the claims do not explicitly require that the "fine mesh material" "resist bending," so the degree of allowable bending is irrelevant to an infringement analysis. By the same token, Liebert's experiment and corresponding opinions are relevant to whether *the unsupported mesh screens* meet the "sufficient stiffness" component of the "fine mesh material" claim limitation but not whether the Accused Products themselves meet the requisite limitation. "To prove infringement, the patentee must show that the *accused device* meets each claim limitation, either literally or under the doctrine of equivalents." *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004)(emphasis added).

Bryer declared that he designed these products to be a two-piece construction in which the mesh screens are dependent on the louvered underlying structure for support. Bryer Decl. ¶ 25. Gutterglove does not dispute that the Louvered Products are designed, manufactured, offered for sale, and sold as two-piece systems. But it insists that the inventor's intent is irrelevant to an infringement analysis. Opp'n at 8. While this is generally true, it does not render irrelevant the

---

[8] Gutterglove objects to this new reply evidence, requested leave to file a sur-reply, and attached it to the request. Dkt. No. 74. The sur-reply was considered as part of defendants' motion.

[9] On this final point, Gutterglove offers a photograph of an embodying product (the Gutter Guard Super product) which bent 0.875 inches under ten pounds of weight. Lenney Decl. ¶¶ 2–3 (Dkt. No. 75); *see* Photographs (Lenney Decl., Exs. 1 and 2).

United States District Court
Eastern District of California

United States District Court
Eastern District of California

undisputed fact that Gutterglove accuses two-part products of infringing its one-part invention.

Turning back to the patent specification, the '747 patent clearly disparages this two-part design:

> With known prior art mesh based gutter guards, commonly an underlying support is provided beneath the mesh. … While effective, such mesh based gutter guards with underlying supports require a two part structure to operate effectively. These two parts increase the cost to manufacture the separate parts as well as adding additional assembly steps to produce the final gutter guard product. Many consumers benefit from having a simpler and potentially lower cost alternative which can still function effectively to preclude leaves and other debris from collecting within a gutter.

'747 patent, Background at 1:45–62. The '747 patent clearly claims a one-part system: "With this invention such a leaf preclusion system is provided with a simple single part construction which can still effectively filter leaves and other debris out while allowing water to pass into the gutter and have the structural support needed to maintain its position overlying the gutter." *Id.* at 1:62–67; *see also id.*, Summary of the Invention at 2:6–7 ("Uniquely, no underlying support is required beneath the filter member.").

Gutterglove nonetheless insists that the two-part Louvered Products infringe their specifically designed one-part system. The parties have dissected the claim term to argue whether the mesh of the Louvered Products has "sufficient stiffness … without requiring an underlying support" to function. But this "issue" is immaterial to the question of infringement given that Gutterglove does not contend that the Louvered Products are made, used, offered for sale, or sold *without their underlying supports*. The claims are to be compared to the accused product, not to a portion of the accused product deconstructed and configured to fit the limitations of the claims. *See Bayer AG*, 212 F.3d at 1247. To make this conclusion abundantly clear, I will re-construe "fine mesh material" and remove the word "requiring" with regards to the underlying support. *See Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002)("District courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."). The "fine mesh material" of the '747 patent is now construed as: a mesh filter member with openings small enough to filter out fine debris while allowing water to pass therethrough and is imbued with

21

properties of sufficient stiffness and ability to overcome water droplet adhesion characteristics *without an underlying support*.

Gutterglove has failed to offer evidence demonstrating a disputed issue whether the Louvered Products have a "fine mesh material" because they each have an underlying support. Defendants' motion for summary judgment of noninfringement based on the '747 patent is GRANTED for the Louvered Products.

### 2. "Being Corrugated with Ridges"

Defendants' second argument for noninfringement of the '747 patent addresses the Diamond Product and specifically focuses on the term "being corrugated with ridges." I construed this term as "shaped into a series of parallel ridges and grooves so as to give strength, extending generally perpendicular to a long axis of a gutter." Defendants lodge three challenges: the ridges of their products are not "parallel;" they do not "extend[] generally perpendicular;" and they do not "give [sufficient] strength."[10] Defs.' MSJ at 11–18.

Defendants urge that the Diamond Product's staggered diamond shapes converge and diverge and are not equidistant. Bryer Decl. ¶ 30, Stein Decl. ¶ 90. As previously discussed, I will not take judicial notice of defendants' proffered dictionary definition of parallel. They fail to identify any support in the intrinsic record for their contention that parallel lines must remain equidistant from one another. Gutterglove's expert testified that the ridges on the Accused Products are parallel because they never converge, irrespective of whether the width between ridges varies. *See* Liebert Decl. ¶¶ 44, 50–52. Since nothing in the intrinsic record supports defendants' limited definition of parallel, I accept the full range of its plain and ordinary meaning and find that Liebert's declaration creates a genuine issue of whether the ridges run parallel.

Slightly more convincing is defendants' argument highlighting the specification's description of corrugations, and specifically, the purpose of those corrugations. The specification provides that "[t]hese corrugations extend perpendicular to a long axis of the gutter and parallel

---

[10] For the latter argument, defendants ask that the court further clarify the claim construction to reflect that the ridges and grooves give *sufficient* strength, not just strength. MSJ at 17–18 (citing '747 patent at 1:62–67). I see no need for that qualifying language.

with a direction that water is migrating off of the roof." '747 patent at 2:16–18. It teaches that the purpose of the corrugations running parallel to water flow is to allow the water to concentrate into drops large enough that it overcomes the adhesion forces and surface tension to pass through the screen. *See id.* at 2:21–28. According to defendants, the Accused Products do the exact opposite—they create obstructions in the water flow, causing the water to flow left or right, thereby creating a siphoning effect as the water runs against the ridges. Bryer Decl. ¶¶ 10, 17–20; *see also* '735 patent at 4:20–39 (explaining the purpose of the S-shaped ridges). In essence, defendants ask me to re-construe the claim to account for the disclosed purpose of the parallel corrugations so that the Accused Products no longer read on this limitation. Their argument leads me to a discussion of whether the Accused Products' ridges extend generally perpendicular.

Defendants insist that none of the Accused Products have ridges and grooves that "extend generally perpendicular to a long axis of a gutter" because they "break left or right," and therefore "cannot realistically be considered perpendicular[.]" *See* Stein Decl. ¶¶ 89–96. During claim construction, I added the word "generally" to indicate that the independent claims of the '747 patent do not mandate that the ridges and grooves run perfectly perpendicular.[11] Gutterglove's expert testified that the ridges and grooves of the Diamond Product are parallel because "they do not touch" if extended out, and they extend "generally perpendicular" as depicted by drawing centerlines through the diamond embossments. Liebert Decl. ¶ 52. Defendants' own expert, Matthew Stein, testified that the Diamond Product has ridges that are parallel, run perpendicular, and give strength to the mesh. Stein Dep. at 56:14–23 (Song Decl., Ex. 2, Dkt. No. 66-2). Thus, even though the Diamond Product employs a thicker mesh with an embossed diamond shape that "give[s] strength," that undisputed fact does not foreclose the conclusion that the Diamond Product's mesh has parallel ridges and grooves that *also* give it strength. Gutterglove has demonstrated a disputed issue whether the Diamond Product's "fine mesh material" is "corrugated with ridges."

---

[11] Dependent claim 2 provides, "The system of claim 1 wherein said ridges of said sheet of fine mesh material extend substantially perpendicular to said upper edge of said sheet of fine mesh material." '747 patent at 8:9–12.

23

### 3. Prosecution History Estoppel

Defendants also argue that Gutterglove is estopped from claiming a broad construction for "being corrugated with ridges" based on arguments presented to the patent examiner during prosecution. MSJ at 49–55. They contend that Robert Lenney, one of the co-inventors, specifically argued for a one-piece gutter screen corrugated with ridges extending between an upper edge and a lower edge of the screen. *See* Costello Decl. ¶¶ 10, 13, 14. From this, defendants maintain that Gutterglove cannot "expand[] the scope of the term 'being corrugated with ridges' to include ridges that are non-corrugated and/or oriented in a way that does not satisfy the terms of the claims." MSJ at 51.

Defendants misconstrue Gutterglove's arguments. Gutterglove does not seek to claim any non-corrugated ridges; rather, it argues that the Accused Products' ridges are corrugated. Defendants' estoppel-based argument is inapplicable. *Cf. Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 33 (1966)("Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.").

Since Gutterglove has demonstrated a disputed issue as to whether the Diamond Product infringes the '747 patent, defendants' motion for summary judgment of Gutterglove's '747 patent claims is DENIED.[12]

## III.    INDUCEMENT TO INFRINGE

Defendants argue that they are entitled to summary judgment on Gutterglove's indirect infringement claims based on inducement because their direct infringement claims fail. MSJ at 72. "It is axiomatic that '[t]here can be no inducement or contributory infringement without an underlying act of direct infringement.'" *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012). Gutterglove has demonstrated a disputed issue whether the Diamond Product directly infringes the '747 patent. *See* discussion *supra*.

---

[12] Having found a disputed issue as to literal infringement, I need not consider the doctrine of equivalents theory of infringement for the '747 patent.

1  Defendants offer no further basis for disposing of Gutterglove's indirect infringement claims. Its

2  motion for summary judgment on induced infringement is DENIED.

3  **CONCLUSION**

4  In accordance with the foregoing, Gutterguard's motion to strike the Bryer Declaration is

5  GRANTED IN PART AND DENIED IN PART. The last sentence of paragraph 25 of the

6  declaration will be STRICKEN because the statement lacks personal knowledge. The motion is

7  denied in all other respects. Defendants' motion for summary judgment is GRANTED IN PART

8  AND DENIED IN PART. Defendants are entitled to a judgment of noninfringement of the '454

9  patent. With respect to the '747 patent, defendants are entitled to judgment of noninfringement of

10  the Louvered Products. Their motion is denied with respect to infringement claims based on the

11  Diamond Product.

12  Since the PTAB is currently reviewing defendants' petitions to invalidate the patents based

13  on obviousness, this case is STAYED pending resolution of those petitions. The parties shall file

14  a notice in this Court within seven days of the resolution that describes briefly the PTAB's

15  decision, and shall contact Ms. Davis, my Courtroom Deputy, to set a case management

16  conference within a month thereafter. A joint case management statement shall be filed a week in

17  advance of the case management conference, setting forth the proposed trial and pre-trial calendar

18  for the remainder of the case. If no decision has been reached by December 1, 2018, the parties

19  shall file a status report on or before December 7, 2018, describing the status and any information

20  concerning the projected date of the PTAB's decision.

21  **IT IS SO ORDERED.**

22  Dated: May 23, 2018

23

24

25  William H. Orrick
    United States District Judge

26

27

28